**STATE of Utah, Plaintiff and Appellee,**

v.

**Carlos R. SAMPSON, Defendant and Appellant.**

No. 890327–CA.

Court of Appeals of Utah.

Sept. 11, 1990.

On Rehearing March 15, 1991.

Andrew A. Valdez, Elizabeth A. Bowman, argued, and Richard G. Uday, argued, Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., and Charlene Barlow, argued, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before BILLINGS, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Defendant appeals his conviction for criminal homicide, murder in the second degree, a first degree felony in violation of Utah Code Ann. § 76-5-203 (1990). We reverse and remand for a new trial.

On November 24, 1986, at approximately 10:30 p.m., defendant entered a 7–Eleven store in Salt Lake County and told the clerks that his daughter had been kidnapped. He asked them to call the police, which they did.

Deputies from the Salt Lake County Sheriff's Office responded. Defendant informed them that his daughter had been abducted from his truck. He gave them a description of his daughter and a photograph. The officers investigated the alleged kidnapping until 4:00 a.m. At some point during the evening, defendant was informed the police did not believe his story. The officers asked defendant to come to headquarters the following morning for a polygraph examination. He agreed.

At approximately 10:30 a.m. on November 25, defendant arrived at police headquarters. He was met by the polygraph examiner, Sergeant Elliot, who had been briefed about the events which occurred on the prior evening. Defendant was escorted to a small interrogation room, hooked up to a polygraph machine, and instructed about how polygraph machines worked. Sgt. Elliot then explained the purpose for giving defendant the test. He said:

> When we walk out of here we ought to be able to tell the detectives Carlos is truthful when he says the child was taken out of the truck, he had not prearranged with anyone to take the child. Uh, also, Carlos is not involved in the death of the child if the child is, in fact, dead. And, uh, those are the two things that we will accomplish today.[1]

After explaining to defendant the purpose of the test, Sgt. Elliot gave defendant the *Miranda* warnings. He began by stating: "Because you are in the cop shop

---

1. These purposes were again repeated during the exam, with even more specificity. Later in the exam, Sgt. Elliot stated:

    Okay, good, okay, uh, at the beginning of the test I told you what the things were that we needed to show. Number one is that you did not arrange with anyone to take the child but that you haven't got someone taking care of her, she is not hidden out and you are not doing this to deprive Antoinette visitation of the child. And, uh, secondly, you did nothing to injure the child and you, and if she in fact is not alive, did not cause her death, right?

there is no doubt in your mind that this is the police station and, uh, because you are in taking a polygraph from a law enforcement agency I must advise you of your rights again." [2] After reading defendant each of his rights, the following exchange ensued:

> Elliot: Okay, having these rights in mind do you wish to talk to me now.
>
> Sampson: Well, uh, should I have a lawyer, I mean, well, I'm really not worried about anything, it is just that. . . .
>
> Elliot: Okay, if you are not worried about anything I would say that is fine, let's go ahead and proceed. Let's get this thing done and get it over with and see what we can do.
>
> Sampson: I'm willing to get it over with.

Defendant then read and signed a form listing his *Miranda* rights and indicating his willingness to take the polygraph test.

During the polygraph examination, Sgt. Elliot asked defendant whether he arranged the disappearance or caused the death of his child and whether he knew where she was hidden.[3] He asked defendant this series of questions four times. To the question concerning where his daughter was hidden, defendant responded in the negative each time and each time the polygraph suggested a deceitful response. After the last set of questions, Sgt. Elliot informed defendant about the test results. He asked defendant why his response to the question concerning whether he knew where his daughter was hidden appeared to be false. Defendant said he thought maybe the child's mother had done something with her.

After concluding the examination, Sgt. Elliot and defendant went to find Salt Lake County Sheriff Pete Hayward. Sgt. Elliot told Sheriff Hayward about the test results. He told him that he believed defendant had been untruthful and informed him that defendant had been "Mirandized," but apparently did not acquaint the sheriff with the particulars of defendant's responses after his rights had been read to him.

Sheriff Hayward then returned with defendant to the polygraph room for further questioning. He did not give defendant the *Miranda* warnings.[4] He informed defendant that there were inconsistencies in his story and that he did not believe defendant was telling the truth. He then asked defendant whether he had injured his daughter. Ultimately, defendant stated his daughter was dead and that he could show the police where she was located.

Defendant accompanied Sheriff Hayward and another deputy to a dumpster in American Fork where his daughter's body was located. After retrieving the body, the officers placed defendant under arrest and returned him to Salt Lake City. When the officers again met with defendant, defendant was read his *Miranda* rights. He agreed to talk with the investigating officer, who thereafter questioned him concerning the circumstances surrounding his daughter's death.

Prior to trial, defense counsel filed a motion to suppress all statements made by defendant during and after the polygraph examination on November 25, 1986, and all evidence derived as a result of those statements. Counsel argued that the police officers had violated defendant's *Miranda* rights by continuing to question him after he made an equivocal request for counsel. The trial court denied the motion.

In support of its decision to deny defendant's motion to suppress, the court stated in pertinent part:

> 2) Do you know where Miyako is hidden now?
> 3) Have you arranged the disappearance of Miyako?

---

**2.** It is not clear from the record why Sgt. Elliot stated that he had to advise defendant of his rights "again." It is clear, however, that the first and only *Miranda* warnings defendant received prior to his formal arrest were given by Sgt. Elliot at the outset of the polygraph examination.

**3.** The specific inculpatory questions asked during the examination were:
1) Have you caused the death of Miyako?

**4.** It is not entirely clear why the sheriff did not give defendant his *Miranda* warnings. Apparently, however, he relied upon Sgt. Elliot's explanation that defendant had been "Mirandized."

The court finds, first, that as you have agreed, the standard of evidence must be a preponderance of the evidence [5] to establish the voluntariness of the interrogation and waiver.

Court finds that the defendant clearly understood what his rights were and what he was waiving, that there is nothing in the record to show that the police did anything or acted in any way improperly so as to constitute any kind of coercion [6] in this matter so as to cause the defendant not to fully understand his rights and to leave him in a position where he was acting in a coerced sort of way. . . .

I believe he had an unfettered right of choice, that he did not request an attorney, that the language "Well, ah, should I have a lawyer, I mean, well, I'm really not worried about anything, it is just that . . ." is not sufficient to cause the police to be concerned as to the claim or any suggestion that the defendant wished to claim a right to counsel.

I also find that there was no need to give continuous advice as to subsequent requests for the selection of counsel [7] or the waiver of the same.

I also find further that the forum was adequate, the [rights] were clearly explained to the defendant. He voluntarily and knowingly waived his right to counsel and I cannot find that the motion to suppress should be granted and, therefore, it is denied.

A five-day jury trial was held in September 1987. Having lost his motion to suppress, defendant sought and obtained a continuing objection to the admission of evidence resulting from the police interrogation. At the conclusion of the trial, the jury found defendant guilty of second degree homicide. He was sentenced to a term of five years to life at the Utah State Prison.

Defendant has raised numerous issues on appeal, but his primary contention is that the court committed prejudicial error when it denied his motion to suppress. Because we must reverse and remand on this issue, we need not address the other issues raised by defendant.

■ Neither party has identified the standard of review for this appeal. However, both parties apparently concede that the trial court's ultimate conclusions concerning the waiver of defendant's *Miranda* rights, which conclusions were based upon essentially undisputed facts, in particular the transcript of Sgt. Elliot's colloquy with defendant, present questions of law reviewable under a correction-of-error standard. Such a conclusion is consistent with the general notion that a trial court's "findings" based upon undisputed facts present questions of law on appeal. *Diversified Equities, Inc. v. American Sav. & Loan Assoc.*, 739 P.2d 1133, 1136 (Utah Ct.App. 1987) (quoting *City of Spencer v. Hawkeye Sec. Ins. Co.*, 216 N.W.2d 406, 408 (Iowa 1974)). *Cf. Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.*, 789 P.2d 24, 25 (Utah 1990) (same standard for review of summary judgment, which necessarily involves undisputed facts). *See also People v. Russo*, 148 Cal.App.3d 1172, 196 Cal.Rptr. 466, 468 (1983) (where *Miranda* warnings and ensuing discussion were recorded, facts deemed undisputed and appel-

**5.** At least one Utah case has recognized "preponderance of the evidence" as the appropriate standard for determining the voluntariness of a waiver of *Miranda* rights. *See State v. Moore*, 697 P.2d 233, 236 (Utah 1985). The preponderance standard is difficult to square with *Miranda*'s holding that the state bears a heavy burden, if counsel was not present, to show a knowing and intelligent waiver of the defendant's *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Nonetheless, the United States Supreme Court has adopted the "preponderance of the evidence" test in evaluating *Miranda* waiver questions. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986).

**6.** The court's comment on coercion represents a bit of an overstatement in view of *Miranda*'s recognition that custodial interrogation is inherently coercive. *See* 384 U.S. at 467, 86 S.Ct. at 1624.

**7.** Despite the court's phraseology in its remarks from the bench, it is apparent from the record that defendant never made any "subsequent requests" for counsel after his statement to Sgt. Elliot.

late court required to "independently assess whether [defendant] knowingly and intelligently waived his rights"). Thus, we do not accord any particular deference to the trial court's conclusions, although couched as findings, but, rather, review them for correctness. *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated that "the prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. at 1612. One of those procedural safeguards is a warning that the defendant has the right to an attorney during custodial interrogation. *Id.* Moreover, the Court noted that if defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444–45, 86 S.Ct. at 1612. Finally, when custodial interrogation continues without the presence of a defense attorney and damaging evidence results from the interrogation, the state has a heavy burden to show that the defendant knowingly and intelligently waived his *Miranda* rights. *Id.* at 475, 86 S.Ct. at 1628.

We must address two questions in this appeal. First, we must determine whether defendant was subject to "custodial interrogation" at the time he made his incriminating statements. Second, assuming custodial interrogation, we must determine whether defendant requested, or knowingly and intelligently waived his right to, counsel.

## CUSTODIAL INTERROGATION

■ Initially, defendant claims the state failed to raise below the issue of whether there actually was a "custodial interrogation" and thus should be precluded from arguing on appeal that there was not. *See generally State v. Marshall*, 791 P.2d 880, 885–87 (Utah Ct.App.1990). Though we agree the state did not dwell on the issue,

it was sufficiently raised at the suppression hearing to be preserved for this appeal. We note, however, that the trial court did not base its denial of the motion to suppress upon the lack of custody nor intimate any doubt that the colloquy between Sgt. Elliot and defendant occurred in conjunction with a custodial interrogation. Instead, it concluded that defendant was informed of his rights, understood his rights, and voluntarily waived them—conclusions which would be irrelevant if the court thought there had been no custodial interrogation.

In *Miranda*, the United States Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The Court expanded on this definition in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.* at 495, 97 S.Ct. at 714. Later, in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam), the Court stated that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* at 1125, 103 S.Ct. at 3520.

Moreover, the United States Supreme Court has indicated that the test is an objective one, i.e., that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). *See, e.g., Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979) (The question is not whether the particular defendant considered himself in custody, but whether a "reasonable person [under the same circumstances] would feel he was not free to leave and break off police question-

ing."); *People v. Algien,* 180 Colo. 1, 501 P.2d 468, 471 (1972) (en banc).

The Utah Supreme Court has identified several key factors to consider in order to determine when a defendant

> who has not been formally arrested is in custody. They are: (1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation.

*Salt Lake City v. Carner,* 664 P.2d 1168, 1171 (Utah 1983). Another factor which we find pertinent to our analysis was recognized by our Oregon counterpart in *State v. Herrera,* 49 Or.App. 1075, 621 P.2d 1209 (1980). That factor is (5) whether the defendant came to the place of interrogation freely and willingly. *Id.,* 621 P.2d at 1212. We now apply these five factors, along with the objective standard adopted in *Berkemer,* to the undisputed facts in this case.

A brief mention of factors (1), (3) and (5) is sufficient because we find them relatively "neutral." Concerning factor (1), the site of interrogation was the police station. Station-house questioning lends itself to a finding of custody, a concept which Sgt. Elliot recognized in his "cop shop" introductory remark, although that fact alone is not conclusive. *See, e.g., Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. Considering factor (3), defendant was apparently not securely restrained or told that he was under arrest until after his daughter's body was discovered. However, it is pertinent to note that he was not specifically informed of his freedom to leave [8] and that once the polygraph examination started, he was restrained in the limited sense that he was hooked to the polygraph machine.[9] Turning to factor (5), the defendant went voluntarily to the police station after receiving an invitation to do so. The fact that he went voluntarily, however, does not mean

he was free to leave during the entire remainder of the interrogation.

The two factors which conclusively tip the scale and persuade us that defendant was in custody are factors (2), the focus of the investigation, and (4), the form of the interrogation. The interplay of these two factors at the time defendant made incriminating statements would lead a reasonable person to believe that he was not free to leave.

Concerning factor (2), the state essentially concedes that the investigation in this case had focused exclusively on defendant. Before the conclusion of the evening when defendant reported the fictitious kidnapping, officers had informed defendant that they did not believe his story. As a result of their disbelief, they requested defendant to return the following morning for a polygraph test. Nothing in the record suggests other suspects were sought or questioned, or other leads pursued, in the meanwhile. The questions asked during the polygraph examination clearly indicate a strong suspicion that defendant had kidnapped or killed his own daughter. It is obvious from these facts that defendant was the prime, if not exclusive, suspect of the police investigation. A reasonable person under the circumstances would surely so have concluded, especially given the expressed disbelief at his story.

Finally, factor (4) weighs heavily in favor of a determination of custody. Utah courts have placed a great deal of emphasis on the form of the questioning in these types of cases. As long as questioning remains merely investigatory, courts have not found custody. *See, e.g., State v. Kelly,* 718 P.2d 385, 391 (Utah 1986). However, when investigatory questioning shifts to accusatory questioning, custody is likely and *Miranda* warnings become necessary. *Carner,* 664 P.2d at 1170. *See also Kelly,* 718 P.2d at 391. The change from investi-

---

8. Under certain circumstances, even defendants who are told they are free to leave will nonetheless be held to have been subjected to custodial interrogation. *See, e.g., United States v. Lee,* 699 F.2d 466, 467–68 (9th Cir.1982) (per curiam).

9. According to the transcript of the polygraph examination, the polygraph machine was attached to defendant by two tubes encircling his trunk, finger plates on his ring and index fingers, and a blood pressure cuff on his right arm.

gatory to accusatory questioning occurs when the "police have reasonable grounds to believe that a crime has been committed and also reasonable grounds to believe that the defendant committed it." *Carner*, 664 P.2d at 1171. *See also Kelly*, 718 P.2d at 391.

Assuming, without deciding, that the polygraph examination itself was merely investigatory,[10] we find that the questioning became accusatory when Sgt. Elliot and Sheriff Hayward determined that defendant had lied on the exam. The officers knew prior to the polygraph exam that a crime had been committed. They suspected kidnapping and possibly even murder. Moreover, they clearly suspected defendant as the perpetrator of the crime. The polygraph exam results merely confirmed their suspicions. Knowing the suspicions of the police and then being confronted with the polygraph exam results, a reasonable person in defendant's position would not have considered himself free to leave at that time.[11] Thus, we hold that, at least as of the time of Sheriff Hayward's questioning of defendant, defendant was subject to custodial interrogation and entitled to proper *Miranda* warnings.

This case is similar to, and the result we reach consistent with, the Colorado case of *People v. Algien*, 180 Colo. 1, 501 P.2d 468 (1972) (en banc). In *Algien*, the defendant,

along with other individuals, was suspected of arson. 501 P.2d at 469. He voluntarily submitted to a polygraph examination. *Id.* At no time was he advised of his *Miranda* rights. *Id.*, 501 P.2d at 470. Prior to the examination he was informed that the purpose of the test was to determine his involvement in the fire. *Id.*, 501 P.2d at 469–70. He was then asked questions concerning his guilt. *Id.* The exam was given three times and each time the test indicated his negative responses were not truthful. *Id.*, 501 P.2d at 470. At the conclusion of the test, he was confronted with the opinion that he was lying and, after discussing the matter, defendant confessed. *Id.*

The trial court in *Algien* found that once the officers concluded defendant was lying during the exam, the suspicion of guilt focused on him and the officers should have read him his *Miranda* rights. *Id.* The Colorado Supreme Court agreed with the trial court and held that "a reasonable person would with logic conclude that he could not leave the premises of his own free will but would be detained for formal arrest." *Id.* at 471. Consequently, it affirmed the decision of the trial court to suppress defendant's confession.

Other courts have applied an *Algien*-type analysis to post-polygraph confessions. *See, e.g., State v. Wright*, 97 N.J. 113, 477

**10.** In view of the result we reach, we need not decide in this case whether the polygraph examination as such was accusatory interrogation and whether defendant was in custody from the inception of the exam. We note, however, that numerous courts have leaned toward finding such examinations to be custodial, a view which seems to command majority support and to be well-reasoned. *See, e.g., State v. Wright*, 97 N.J. 113, 477 A.2d 1265, 1269 (1984) (noting that strict *Miranda*-type analysis is typically applied to polygraph confessions); *Commonwealth v. Bennett*, 439 Pa. 34, 264 A.2d 706, 707 (1970) (state's suggestion that defendant was not in custody for polygraph was "attempt to have [court] submerge [its] intelligence"); *State v. Faller*, 88 S.D. 685, 227 N.W.2d 433, 435 (1975) ("situation a lie detector test presents can best be described as a psychological rubber hose"); *Creeks v. State*, 542 S.W.2d 849, 851 (Tex.Cr. App.1976) (where investigation has focused on defendant, *Miranda* warnings required before polygraph); *People v. Carter*, 7 Cal.App.3d 332, 88 Cal.Rptr. 546, 549 (1970) ("Questioning dur-

ing the course of a lie detector test certainly qualifies as a form of custodial interrogation."), *overruled on other grounds*, 6 Cal.3d 441, 492 P.2d 1, 99 Cal.Rptr. 313 (1972). *But see, e.g., Whalen v. State*, 434 A.2d 1346, 1352 (Del.1980) ("appearance at the police station for the polygraph test demonstrates a waiver of his *Miranda* rights"), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982); *People v. Bailey*, 140 A.D.2d 356, 527 N.Y.S.2d 845, 847–48 (1988) (willingness to aid in investigation demonstrated that polygraph not custodial).

**11.** The state cites testimony to the effect that defendant did not consider himself under arrest even after he was formally arrested, suggesting this demonstrates that defendant could not have believed he was in custody when he first confessed. This evidence is at most a commentary on defendant's acumen. Under the objective "reasonable person" test, defendant's subjective belief about custody is not relevant. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

A.2d 1265, 1269 (1984) ("When defendants are not advised of their *Miranda* rights, or do not properly waive them, confessions elicited *after* a polygraph test are typically suppressed."); *People v. Harris,* 128 A.D.2d 891, 513 N.Y.S.2d 817, 818 (1987) (mem.) (confession admissible because defendant appeared voluntarily for polygraph test and fully advised of rights before post-polygraph confession). The rationale of these polygraph cases comports with our view of custodial interrogation and thus we adopt their reasoning in this case.

We need not decide whether defendant was in custody from the inception of the polygraph examination [12] because no confession was elicited until after the exam was completed and the sheriff summoned. It is sufficient to conclude that, Sgt. Elliot having determined defendant was lying in the exam, *Miranda* warnings were necessary before further questioning could properly proceed.

It is clear from the record that defendant was not given *Miranda* warnings between the conclusion of the polygraph exam and the time he was formally arrested.[13] Thus, unless we find that defendant's *Miranda* rights were adequately protected by reason

---

**12.** *But see* note 10, *supra.* It is interesting to note that the polygraph examiner considered *Miranda* warnings at the outset of the polygraph examination to be a necessity. He stated: "Because you are in the cop shop there is no doubt in your mind that this is the police station and, uh, because you are in taking a polygraph from a law enforcement agency I must advise you of your rights...." *But see People v. Sohn,* 148 A.D.2d 553, 539 N.Y.S.2d 29, 31 (1989) (mem.) (giving of *Miranda* warnings was "apparently out of an 'excess of caution' [and did] not preclude a finding that [defendant] was not in custody").

Sergeant Elliot's approach, whether or not legally required, surely seems prudent, if for no other reason than that it forecloses the possibility a suspect will blurt out a confession after his deception has been ascertained but before *Miranda* warnings can be issued. Moreover, as an arm of the state, the police have a responsibility to protect the constitutional rights of the citizenry, and erring on the side of giving the *Miranda* warnings before they are strictly required advances that function, as well as minimizes the risk that important evidence will be excluded because the warnings were not given early enough in the process.

**13.** As indicated previously, Sheriff Hayward apparently relied upon Sgt. Elliot's claim that defendant had been properly "Mirandized" at the commencement of the polygraph exam. Although Sheriff Hayward, out of the same abundance of caution that may have motivated Sgt. Elliot, should ideally have given new *Miranda* warnings to defendant prior to interrogating him, the earlier warnings would have sufficed had Sgt. Elliot elicited a clear waiver of those rights from defendant at that time. *See State v. Martinez,* 595 P.2d 897, 899–900 (Utah 1979) (the law does not require repetition of *Miranda* rights within a short period of time and a continuous sequence of events even though defendant's status may actually change in the interim).

The state did not argue that Sheriff Hayward's "good faith" reliance upon Sgt. Elliot's claim he

previously issued *Miranda* warnings warranted an exception to the exclusionary rule. However, we note that, contrary to the trend in the Fourth Amendment area, courts have declined to create a "good faith" exception in the context of the Fifth Amendment. *United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983) (per curiam) ("once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect"). *See also Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704 (1988) (implicitly rejecting "good faith" argument); *White v. Finkbeiner,* 687 F.2d 885, 887 n. 9 (7th Cir.1982) (declining to create exception absent clear indication from United States Supreme Court), *vacated on other grounds,* 465 U.S. 1075, 104 S.Ct. 1433, 79 L.Ed.2d 756 (1984).

An excellent treatment of a possible "good faith" exception to the Fifth Amendment exclusionary rule is found in M. Gardner, *The Emerging Good Faith Exception to the Miranda Rule—A Critique,* 35 Hastings L.J. 429 (1984). Professor Gardner concludes:

While there may be reason to doubt the constitutional necessity of the fourth amendment exclusionary rule, the fifth amendment privilege *is itself* a constitutionally required exclusionary rule. Whereas a fourth amendment violation occurs at the moment of the unlawful privacy violation, violations of the privilege against self-incrimination do not occur unless and until the government uses the tainted evidence against the defendant in a criminal proceeding. Although alternatives to the exclusionary rule might conceivably be developed to protect fourth amendment privacy interests, no alternative could possibly protect the fifth amendment values of maintaining an accusatorial system and respecting the dignity of criminal defendants. If use of compelled self-incriminating evidence is permitted, the fifth amendment's protection is destroyed.

*Id.* at 462–63.

of the exchange at the outset of the polygraph examination undertaken by Sgt. Elliot,[14] there was no adequate "Mirandizing" of defendant before he gave his custodial confession. We now examine whether defendant validly waived his *Miranda* rights at that time.

### WAIVER

On appeal, defendant does not argue that the state failed to adequately inform him of his *Miranda* rights. Prior to the polygraph examination, Sgt. Elliot carefully informed defendant of each of his rights. Instead, defendant argues that he made an "equivocal request" for counsel which the state failed to clarify and, if appropriate, to honor. It is telling that the state does not address this issue on appeal, but instead puts all its eggs in the "no custodial interrogation" basket. Nonetheless, because the state stops short of conceding the point and in view of its importance, we will address the issue in some detail.

■ Initially we note that, though a defendant may waive his rights to remain silent and to have an attorney present during custodial interrogation, "these waivers must be both intentional and made with full knowledge of the consequences, and the defendant is given the benefit of every reasonable presumption against such a waiver." *State v. Fulton*, 742 P.2d 1208, 1211 (Utah 1987), *cert. denied*, 484 U.S. 1044, 108 S.Ct. 777, 98 L.Ed.2d 864 (1988). *See also Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). Consequently, the state has a heavy burden to establish both that a de-

fendant understood his *Miranda* rights and that he voluntarily waived them. *State v. Velarde*, 734 P.2d 440, 443 (Utah 1986).

■ The state argued below, and the trial court found, that defendant's statement "Well, ah, should I have a lawyer, I mean, well, I'm really not worried about anything, it is just that ..." did not qualify as even an equivocal request for counsel which the police had to be concerned about. We disagree.

In *Miranda*, the United States Supreme Court stated: "If [defendant] indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. at 444–45, 86 S.Ct. at 1612 (emphasis added). Thus, a defendant's "request for counsel may be ambiguous or equivocal," *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984) (per curiam), and still qualify as an invocation of *Miranda* rights.

This court dealt with an equivocal request for counsel in *State v. Griffin*, 754 P.2d 965 (Utah Ct.App.1988). In *Griffin*, the defendant stated during interrogation, "This is a lie. I'm calling an attorney." *Id.* at 966. We held that this statement "was arguably equivocal." *Id.* at 969. Defendant's statement in this case was less forceful than that in *Griffin*. However, other jurisdictions have found statements very similar to the one in this case to have constituted equivocal requests for counsel. *See, e.g., United States v. Cherry*, 733 F.2d 1124, 1127 (5th Cir.1984) ("Maybe I should talk to an attorney before I make a further

---

**14.** We note that defendant was given a second set of *Miranda* warnings after he had informed Sheriff Hayward that his daughter was dead, gone with the police to American Fork to retrieve the body, been arrested, and been returned to Salt Lake City. Apparently recognizing that by that time all the damage had been done, the state does not argue the second set of *Miranda* warnings are of any consequence to our analysis.

Defendant, on the other hand, argues that because he had previously invoked his right to counsel, albeit equivocally; had not been provided an attorney; and had not initiated any subsequent interrogation with the police, the fruits of the post-arrest interrogations must also

be suppressed. We agree. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that once a defendant has invoked his right to counsel, statements made without counsel in subsequent interrogations initiated by the police, even when pursuant to renewed *Miranda* warnings, must be suppressed. *Id.* at 484–87, 101 S.Ct. at 1884–86. *See also State v. Moore*, 697 P.2d 233, 237 (Utah 1985) (accused must initiate conversation). The rule in *Edwards* applies even more forcefully in a case such as this where the subsequent interrogation is prompted by, and designed to explain, information which has come to the police as a direct result of an earlier *Miranda* violation.

statement."), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *United States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir.1985) ("might want to talk to a lawyer"), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *United States v. Prestigiacomo*, 504 F.Supp. 681, 683 (E.D.N.Y.1981) (mem.) ("maybe it would be good to have a lawyer"); *Cheatham v. State*, 719 P.2d 612, 618 (Wyo.1986) (after being asked if he wanted to talk, defendant responded "Well I don't care, I'd like to see a lawyer, too you know"); *Hampel v. State*, 706 P.2d 1173, 1176 (Alaska Ct.App.1985) ("I've got one question ... [and the question is concerning a lawyer] ... how would I be able to get one, a lawyer?"); *People v. Russo*, 148 Cal. App.3d 1172, 196 Cal.Rptr. 466, 468 (1983) ("I don't know if I should have a lawyer here or what."); *State v. Moulds*, 105 Idaho 880, 673 P.2d 1074, 1083 (Ct.App.1983) ("Maybe I need an attorney"); *State v. Smith*, 34 Wash.App. 405, 661 P.2d 1001, 1003 (1983) ("Do you think I need an attorney?"). *See also United States v. Porter*, 764 F.2d 1, 6 (1st Cir.1985) (unsuccessful call to attorney's office in presence of officer treated as equivocal request for counsel), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *People v. Quirk*, 129 Cal.App.3d 618, 181 Cal.Rptr. 301, 308 (1982) (inquiry by defendant as to whether wife had hired an attorney treated as equivocal request for counsel). We hold that defendant's statement in this case was of a caliber similar to those just quoted, and like them, constituted an equivocal request for counsel.[15] *See also* Comment, *Equivocal Requests for Counsel: A Balance of Competing Policy Considerations*, 55 Cinc.L.Rev. 767, 770–71 (1987) [hereinafter "The Cincinnati Comment"] (categorizing recurring types of equivocal requests for counsel, including as one category "[i]ndecisive statements that indicate uncertainty in the suspect's mind about the need or advisability of obtaining legal representation").

Courts have developed different standards to handle equivocal requests for counsel. The United States Supreme Court identified three methods for handling equivocal requests in *Smith v. Illinois*, 469 U.S. 91, 95–96 & n. 3, 105 S.Ct. 490, 492–93 & n. 3, 83 L.Ed.2d 488 (1984), but declined to identify any of them as the constitutionally correct one.

> Some courts have held that all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous.... Others have attempted to define a threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel.... Still others have adopted a third approach, holding that when an accused makes an equivocal statement that "arguably" can be construed as a request for counsel, all *interrogation must immediately cease except for narrow questions designed to "clarify" the earlier statement and the accused's desires respecting counsel.*

*Id.* at 96 n. 3, 105 S.Ct. at 493 n. 3 (emphasis added). In *Griffin*, this court adopted the third approach, holding "that when an accused makes an arguably equivocal request for counsel during custodial interrogation, further questioning must be limited to clarifying the request." 754 P.2d at 969. We remain convinced that this middle approach[16] is preferable to either of the two more extreme positions and note that it is regarded as the majority view. Note, *Judicial Approaches to the Ambiguous Request for Counsel*, 62 Notre Dame L.Rev. 460, 472 (1987) [hereinafter "The Notre Dame Note"]. It is also favored by commentators as the approach which best balances the interests of law enforcement and the rights of the accused. *See, e.g.*, Note,

---

**15.** "Equivocal request" appears to be an imprecise term in this context. Many of the references to attorneys which are held to be equivocal requests for counsel are not requests at all. It may be preferable to refer to such statements as "equivocal references to an attorney." *See, e.g.,* Note, *The Right to Counsel During Custodial Interrogation: Equivocal References to an Attorney*, 39 Vand.L.Rev. 1159 (1986) [hereinafter "The Vanderbilt Note"].

**16.** *See* The Vanderbilt Note at 1187 (clarification approach represents "a middle position").

*The Right to Counsel During Custodial Interrogation: Equivocal References to an Attorney,* 39 Vand.L.Rev. 1159, 1187–94 (1986); The Notre Dame Note at 472–73; The Cincinnati Comment at 783.

Unfortunately, neither Sgt. Elliot nor Sheriff Hayward attempted to clarify defendant's equivocal reference to an attorney. The transcript of the polygraph examination—and the actual tape is not part of our record—indicates a pause following defendant's equivocal statements about counsel after which Sgt. Elliot stated "Okay, if you are not worried about anything I would say that is fine, let's go ahead and proceed." Nothing in this statement by Sgt. Elliot nor any subsequent statement amounts to an effort to clarify defendant's request. Although, as indicated previously, the state did not see fit to brief the "equivocal request for counsel" issues on appeal, it argued below that defendant's subsequent statement that he was "willing to get it over with" was sufficient to clarify his position and to demonstrate a waiver of his right to counsel.[17] We disagree.

This case is similar to *United States v. Prestigiacomo,* 504 F.Supp. 681 (E.D.N.Y. 1981) (mem.), and *State v. Moulds,* 105 Idaho 880, 673 P.2d 1074 (Ct.App.1983),

which were favorably cited by this court in *Griffin.* In *Prestigiacomo,* the interrogator did not clarify the defendant's equivocal request for counsel. 504 F.Supp. at 682. Instead, he asked defendant whether he would continue to answer questions. *Id.* After receiving an affirmative response, he proceeded to interrogate him. *Id.* The court in that case found the interrogator had given "the impression that what defendant said would not be treated as a sign, albeit an equivocal one, that he wished a lawyer." *Id.* at 684. That tactic was improper and, consequently, the court suppressed the statements which resulted from further interrogation. *Id.*

In *Moulds,* the defendant made an equivocal request for counsel. 673 P.2d at 1083. Instead of clarifying the request, the interrogator recognized defendant's right, informed defendant that the decision was his to make, and then proceeded to discuss the case with defendant. *Id.* Thereafter, the defendant made incriminating remarks. *Id.* The Idaho court found that defendant's "statements were the products of interrogation continued at the instance of the police after the right to counsel had been invoked." *Id.,* 673 P.2d at 1085. Consequently, the court affirmed the suppression of the statements. *Id.*

---

**17.** The state also argued below that defendant's signing the written waiver form, on the heels of his "willing to get it over with" comment, clarified that his position was to waive his right to counsel. At least one court has accepted this argument. *See State v. Smith,* 34 Wash.App. 405, 661 P.2d 1001, 1003 (1983). In *Smith,* the defendant signed a waiver form subsequent to his equivocal reference to counsel and then proceeded to speak with the officers. Our Washington counterpart found those facts sufficient to demonstrate a waiver on the part of the defendant.

We decline to adopt the Washington position for three reasons. First, we find the position inconsistent with the presumption against waiver. *See State v. Fulton,* 742 P.2d 1208, 1211 (Utah 1987). Second, we have already noted that once a defendant invokes his right to counsel, statements made in subsequent interrogations, without counsel present and even if pursuant to renewed warnings, must also be suppressed unless defendant initiates the contact. *See* note 14, *supra.* If police cannot circumvent the rule through renewed *Miranda* warnings days after a request for counsel, we see no

reason to allow them to do so through a simple waiver form given on the heels of the equivocal reference without any clarification. Finally, other courts have not found a waiver where the defendant has signed a waiver form immediately after an unclarified, equivocal reference to counsel. *See, e.g., United States v. Prestigiacomo,* 504 F.Supp. 681, 682–84 (E.D.N.Y.1981) (mem.). *Cf. United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985) ("[T]he police may not use a statement a suspect makes after an equivocal request for counsel, but before the request is clarified, as an effective waiver of the right to counsel."). Especially in this case, that approach makes sense. Once defendant made an equivocal reference to counsel, as explained in the text Sgt. Elliot could properly do only *one thing*—seek clarification. Instead, he concluded that defendant was "not worried," that they should "proceed … and get it over with….," and he submitted the written form to defendant for signature. In effect, submission of the written form to defendant was an integral part of Sgt. Elliot's conduct which was at odds with his duty to clarify and as such, the written form cannot be taken as clarifying defendant's equivocal request.

The fatal flaw in both *Prestigiacomo* and *Moulds* was the failure to cease interrogation except for the very limited purpose of clarifying whether defendant wished to assert his right to counsel. The fact that defendant continued to answer questions was not a sufficient indication that he was abandoning his right to counsel. In contrast, *Griffin* serves as an example of a valid waiver of *Miranda* rights following clarification of an ambiguous reference to counsel. In *Griffin*, defendant was advised of his *Miranda* rights, which he waived. 754 P.2d at 966. However, during the ensuing interview there came a time when he said, "I'm calling an attorney." *Id.* The interrogating officer immediately asked, "OK, are you saying you don't want to talk anymore?"[18] *Id.* at 966–67. Defendant's response indicated he would continue to talk to the detective at that time, but planned to talk to an attorney later. *Id.* at 967. Thus, although the conviction in *Griffin* was reversed on other grounds, further interrogation following the clarify-ing exchange just described was held not violative of defendant's *Miranda* rights.

Defendant's statement in this case included a reference to an attorney which is properly classed as an equivocal request for counsel. Because Sgt. Elliot's warnings were the only *Miranda* warnings which defendant received before undergoing custodial interrogation, it was necessary that someone clarify that equivocal request before defendant could be subjected to custodial interrogation. Defendant's request was never clarified and, consequently, the state failed to demonstrate a valid waiver of defendant's right to counsel. The trial court erred in holding to the contrary. We accordingly reverse and remand for a new trial.

Because the trial court concluded that defendant's *Miranda* rights had not been violated, the parties did not have occasion to argue which evidence had to be excluded and whether any exceptions to the exclusionary rule might apply.[19] On remand,

---

18. The main problem inherent in the clarification approach is "the additional opportunity given to law enforcement officials to ... [use] clarifying questions to dissuade" suspects from asserting their right to counsel. The Notre Dame Note at 472. *See Anderson v. Smith*, 751 F.2d 96, 104 n. 9 (2nd Cir.1984); *Daniel v. State*, 644 P.2d 172, 177 (Wyo.1982) (permissible for officer to "seek clarification of the suspect's desires, as long as he does not disguise the clarification as a subterfuge for coercion or intimidation"). *See also Thompson v. Wainwright*, 601 F.2d 768, 771–72 (5th Cir.1979) (during purported effort to clarify, officer asserted that obtaining counsel may not be in defendant's best interest); *Hampel v. State*, 706 P.2d 1173, 1182 (Alaska Ct.App.1985) (during purported effort to clarify, officer emphasized delay and complexity of obtaining an attorney).

One commentator has suggested that only one question should be permitted to seek clarification. With our embellishment in the form of an introductory statement, that question is as follows: You have been advised of your rights, including the right to have an attorney with you during this interview even if you cannot afford to hire one. What you just said leads me to wonder whether or not you wish to avail yourself of that right. "Do you want the assistance of [an attorney] at this time or do you agree to answer questions without the presence of [an attorney]?" Comment, *Equivocal Requests for Counsel: A Balance of Competing Policy Considerations*, 55 Cinc.L.Rev. 767, 782 (1987).

19. The "independent source doctrine" and "inevitable discovery rule" are among the exceptions to the exclusionary rule. *See State v. Northrup*, 756 P.2d 1288, 1292–94 (Utah Ct.App.1988). The state had no occasion to argue either exception, on appeal or below. Consequently, we are unable to determine whether either of these exceptions might apply in this case to some of the evidence which might otherwise have to be suppressed.

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). Thus, any evidence which was discovered apart from defendant's statements made during custodial interrogation need not be excluded.

The inevitable discovery rule allows the admission of evidence as long as "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. at 2509. *See, e.g., People v. Freeman*, 739 P.2d 856, 860 (Colo.Ct. App.1987) (body of deceased victim was so conspicuously located that discovery was inevitable); *State v. Miller*, 300 Or. 203, 709 P.2d 225, 242–43 (1985) (hotel maid would inevitably have discovered body of deceased victim within 56 hours of actual discovery and reported discovery to police), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). Under this rule, the prosecution must show that the evidence "would" have been discovered, not

the parties must of course be allowed to argue these various points. After entertaining these arguments, the trial court must exclude all primary evidence elicited during the custodial interrogation and all incriminating evidence derived therefrom which is not saved by an exception to the exclusionary rule. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966); *Nix v. Williams,* 467 U.S. 431, 441, 104 S.Ct. 2501, 2507, 81 L.Ed.2d 377 (1984).

Our decision is a difficult one and will be a source of consternation to many, who will question why the state should be put to the cost and burden of having to retry someone who clearly is guilty. But while the results in particular cases may be unwelcome, "[t]he fifth amendment exclusionary rule is clearly dictated by the Constitution and is the only possible means of protecting the values underlying the privilege against self-incrimination." M. Gardner, *The Emerging Good Faith Exception to the Miranda Rule—A Critique,* 35 Hastings L.J. 429, 466 (1984). We accordingly reverse and remand for proceedings consistent with this opinion.

BILLINGS and GREENWOOD, JJ., concur.

## ON PETITION FOR REHEARING

### "New" Matter

In its first brief and oral argument before this court, the state, as to the range of *Miranda* issues, made a deliberate tactical decision to rely solely on the theory that defendant was not subjected to "custodial interrogation" at the time of the polygraph examination, *supra* at 1108, an issue which has now been resolved in defendant's favor. *See id.* In our initial opinion we regarded this approach by the state as "stop[ping] short of conceding" defen-

dant's arguments concerning his equivocal request for counsel. *Id.* In its petition for rehearing, the state now argues for the first time that defendant's response to subsequent *Miranda* warnings [20] adequately served to clarify defendant's equivocal request for counsel or, perhaps more accurately, obviated any need to clarify the request.

While the state's decision not to develop this issue at trial is understandable in light of the state's success there on the argument that defendant had not even equivocally invoked his right to counsel when first given *Miranda* warnings, *see supra* at 1108, the state should have raised the argument in initial briefing on appeal if it believed this fall-back position had merit. Given the posture of the trial court proceedings, this would not have run afoul of our proscription against raising arguments for the first time on appeal. But in such a situation, consistent with our standing aversion to considering for the first time at some later stage issues that could have been raised at an earlier stage, we ordinarily will not consider arguments presented for the first time on petition for rehearing, and are especially loathe to revisit a decision once rendered when the party seeking reconsideration intentionally did not present us with particular arguments in more timely fashion. *See State v. Marshall,* 791 P.2d 880, 885–87 (Utah Ct.App.), *cert. denied,* 800 P.2d 1105 (Utah 1990).

However, we are not unsympathetic to the sheer volume and complexity of issues presented in this case, some ten having been raised by appellant, even though we found it necessary to reach only two in our initial opinion. *See supra,* at 1103. Even without addressing the issues of whether, assuming custodial interrogation, defendant equivocally invoked his right to counsel and, if he did, whether the subsequent

---

simply that it "could" or "might" have been discovered. *Miller,* 709 P.2d at 242. *See also United States v. Romero,* 692 F.2d 699, 704 (10th Cir.1982). It is altogether unclear from the record before us how much, if any, of the evidence discovered as a result of the improper custodial interrogation would inevitably have been discovered.

20. In view of the state's prior position, we made only minimal reference to the subsequent warnings in our initial opinion, noting that "the state does not argue the second set of *Miranda* warnings are of any consequence to our analysis." *Supra* at 1108 n. 14.

warnings cured the problem, the state's initial brief ran well over our page limit for briefs.

Considering the state's burden when confronted with multiple issues of the magnitude presented here, in conjunction with the significance of the waiver issue, and in light of helpful authority from the United States Supreme Court which was not available at the time of initial argument, we grant the state's petition for rehearing and proceed to treat its claim that the subsequent *Miranda* warnings and defendant's response thereto served to clarify his prior equivocal request for counsel or at least rendered it inconsequential as to the incriminating statements he made after getting new *Miranda* warnings.[21]

### Subsequent Miranda Warnings As Clarifying Equivocal Request

■ The state concedes for purposes of our further review that Sergeant Elliot erred in failing to follow firmly established precedent by not clarifying defendant's equivocal reference to counsel when defendant was first given the *Miranda* warnings. However, the state argues that a subsequent set of warnings, subsequent waiver by defendant, and information gleaned from the subsequent interrogation purged the taint of illegality introduced by the earlier disregard of defendant's equivocal request for counsel. The state calls our attention to *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and claims we improperly relied on *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *See Sampson*, at 1108 n. 14. The state focuses particularly on an ambiguous footnote in *Edwards*. *See* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9.

In *Elstad*, the United States Supreme Court held that a defendant's subsequent statement, given after an initial statement made without the benefit of *Miranda* warnings, may be admissible when *Mi-*

*randa* warnings preceded the subsequent statement and there were no improper or coercive tactics employed by police in connection with the initial statement. *Elstad*, 470 U.S. at 314, 105 S.Ct. at 1296. The Court's rationale was that *Miranda*'s protective measures, not the Fifth Amendment itself, were violated in such a case, making suppression of the later statements unnecessary. *Elstad*, 470 U.S. at 308, 105 S.Ct. at 1292.

On the other hand, in *Edwards* the Court emphasized that, unless an accused initiates the encounter, police cannot re-administer *Miranda* warnings and renew interrogation once a defendant has "clearly asserted" his or her right to counsel on an earlier occasion when *Miranda* warnings were actually given. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

The state invites us to focus total attention on the "clearly asserted" language in *Edwards*, and hold that *Edwards* is accordingly inapplicable. The state would have us instead employ the *Elstad* rationale, because defendant did not *clearly* assert his right to counsel in this case, and determine whether the Fifth Amendment itself was violated. In essence, the state asserts we must find that defendant effectively waived his right to counsel when he was given new *Miranda* warnings and said nothing about counsel since the failure to clarify the equivocal request for counsel was "only" a violation of the *Miranda* doctrine, not a violation of the Fifth Amendment.

We recognize that waiver of constitutional rights is "possible ... when the request for counsel is equivocal." *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1886 n. 9. But we are hard-pressed to see how an equivocal request for counsel can be meaningfully waived in advance of its having ever been clarified.

"The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application." *Minnick v. Mis-*

---

**21.** We note that these circumstances are unique and hasten to caution that the complexity of issues, the length of briefs, or a tactical choice to initially avoid issues on appeal will normally not suffice to induce us to consider issues raised for the first time on a request to reconsider a decision already made.

*sissippi*, —— U.S. ——, 111 S.Ct. 486, 490, 112 L.Ed.2d 489 (1990). A defendant who requests counsel "is not subject to further interrogation by the [police] until counsel has been made available to him...." *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885. The *Edwards* decision leaves no room for ambiguity or uncertainty in the context of a clear invocation of the right to counsel. The singular event which may occur upon a defendant's request for counsel is for the defendant to consult with counsel.[22] Neither the passage of time, however great, nor the administration of additional *Miranda* warnings will allow officers to begin interrogation anew unless the suspect has been given the chance to consult with an attorney.

Obviously, the instant case does not fit squarely into either the *Elstad* or the *Edwards* framework. Unlike in *Elstad*, *Miranda* warnings were given to Sampson at the outset; unlike in *Edwards*, Sampson's request for counsel was not unequivocal. But we think the equivocal request for counsel situation is conceptually and practically more analogous to a clear request for counsel, as in *Edwards* and *Minnick*, than it is to a wholly unwarned statement as in *Elstad*. By analogy to the point made in the preceding paragraph regarding a clear request for counsel, it would appear that the singular event which may occur upon a defendant's equivocal reference to counsel is for defendant's "request" to be

clarified. *See supra*, at 1110 n. 17 ("Once defendant made an equivocal reference to counsel ... Sgt. Elliot could properly do only *one thing*—seek clarification."). Neither the passage of time, however great, nor the administration of additional *Miranda* warnings will allow officers to reconvene interrogation absent clarification. If a signed waiver executed immediately after the equivocal request for counsel will not be taken as adequate clarification, *see id.*, 1110, there is no reason why a waiver later in time should be recognized as such. Simply put, we believe that an equivocal request for counsel must be treated by the police and analyzed by the courts as though it were an unambiguous request for counsel—until such time as it has been properly clarified and shown to be otherwise.[23]

### Violation Of Miranda vs. Violation Of Fifth Amendment

■ The state urges that the subsequent confession and derivative evidence were properly admitted under *Elstad*, claiming the failure to clarify defendant's equivocal request for counsel, although a violation of *Miranda*, was not violative of the Fifth Amendment itself. In advancing its *Elstad* argument, the state principally relies on *Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).[24] In *Mar-*

---

22. The *Edwards* Court did not foreclose the possibility of waiver of the right to counsel when a defendant, once having invoked the right, freely initiates further conversation with officers even though the defendant has not consulted counsel. *See* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. *See also United States v. De La Luz Gallegos*, 738 F.2d 378, 381 (10th Cir.) (where attorney is requested but not yet provided, *Edwards* does not preclude introduction of voluntary statements not made as a result of police questioning), *cert. denied*, 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984).

23. The concern which explains our view is, in large part, this: In the course of properly clarifying an equivocal request, the sanctity of an accused's right to counsel will be brought home for the accused. *See supra* at 1110. If instead an equivocal request is ignored, and the timid or ignorant suspect's halting effort to explore the advisability of seeking counsel is apparently

for naught, the suspect may perceive he is being discouraged from availing himself of the right to counsel. Someone in defendant's shoes who simply gets a new set of *Miranda* warnings with no acknowledgment of his prior reference to counsel may think: "I wondered before if I should have a lawyer. My question was ignored. There's no sense in raising it again."

24. The state has cited other cases to similar effect in its petition and at oral argument. *E.g.*, *United States v. Gonzalez–Sandoval*, 894 F.2d 1043 (9th Cir.1990); *United States v. Barte*, 868 F.2d 773 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 547, 107 L.Ed.2d 543 (1989); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987); *United States v. Patterson*, 812 F.2d 1188 (9th Cir.1987), *cert. denied*, 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988); *Thompson v. Wainwright*, 601 F.2d 768 (5th Cir.1979); *United States ex rel. Hudson v. Cannon*, 529 F.2d 890 (7th Cir.1976). Even if they were otherwise persuasive, the

*tin,* the suspect was given his *Miranda* warnings. In the course of interrogation, he asked: "Can't we wait until tomorrow?" *Martin,* 770 F.2d at 922–23. The Eleventh Circuit held this question was an equivocal request to *terminate questioning and to invoke the right to remain silent,* at least temporarily. It is notable that the court did not find the question to be an equivocal request for counsel, although it determined that an equivocal request to terminate questioning should be treated analogously to an equivocal request for counsel. *Martin,* 770 F.2d at 924.

The court held that the defendant's first confession, given subsequent to his equivocal request to remain silent which was not honored, was inadmissible as violative of *Miranda. Martin,* 770 F.2d at 924. The court stated that the failure to terminate questioning pending clarification, like the failure to give *Miranda* warnings in the *Elstad* context, violates the technical requirements of the *Miranda* rule although it does not violate the Fifth Amendment. *Id.* at 928–29. But because the first confession was not coerced, the court upheld admission of a second confession, given several days later and on the heels of renewed *Miranda* warnings, and after the defendant had consulted with counsel. *Id.* at 929.

The state asks us to treat the failure to clarify defendant's equivocal request for counsel in this case in similar fashion to *Martin* and to determine that it was merely a technical violation of the *Miranda* rule, and therefore does not bar introduction of defendant's subsequent confession made after new *Miranda* warnings were given. In urging this analogy, the state slights the continued vitality and invigoration given *Edwards v. Arizona* in subsequent Supreme Court decisions, including the recent decisions in *Minnick v. Mississippi,* — U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) and *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Moreover, such an analysis is inapposite given our determination that an equivocal reference to counsel should be, until properly clarified, treated on equal footing with an unambiguous request to speak to an attorney.[25]

A rigid insistence on clarification of the equivocal request for counsel if interrogation is to continue requires just that—clarification. *State v. Griffin,* 754 P.2d 965, 969 (Utah Ct.App.1988). An equivocal request is simply not clarified by being ignored by the police. Clarification necessarily implies that the equivocal request must be acknowledged by the interrogator. The interrogator must ask something like: "Your response suggests that you may

cases cited by the state are readily distinguishable in that no case involves two sets of *Miranda* warnings—the first followed by an equivocal request for counsel and the second followed by apparent waiver—as is the case before us. The cases, with the exception of *Martin* which we treat more fully in the text, instead involve some variation on the *Elstad* theme— statements made without *Miranda* warnings, followed by *Miranda* warnings, waiver, and further statements.

The state additionally cites, in a letter submitted after argument on the petition for rehearing, *State v. Christofferson,* 793 P.2d 944 (Utah Ct.App.1990), claiming that this court there "held that [a] second set [of warnings] served as a clarification of the equivocal request." We do not read *Christofferson* this way. The police officers in *Christofferson* apparently ceased questioning after the equivocal request for counsel, and proceeded to clarify the defendant's equivocal request. Once they did so and learned that the defendant did not desire counsel, the officers continued interrogation. *Id.* at

947. We hesitate to read the decision as equating a mere second administration of *Miranda* warnings, even if no *Miranda* rights were then invoked, with definitive clarification of an equivocal request for counsel. Such an important and far-reaching conclusion would surely have been accompanied by lengthy discussion and analysis, which is not to be found in the opinion, and is at odds with language in the opinion noting that clarifying questions were asked prior to proceeding with a second set of warnings and further interrogation. *See id.*

**25.** The state's proffered analysis is further flawed in that the bright-line rule of *Edwards,* cited in *Minnick v. Mississippi* for "clarity of its command" and "certainty of its application," 111 S.Ct. at 490, would be undermined if courts were required to receive evidence pertaining to the lack of coercion attending an equivocal request for counsel. In addition to breeding contempt for a cherished constitutional right, significant judicial resources would be needlessly expended, a result clearly eschewed in *Edwards* and its progeny.

wish to consult with an attorney before answering any of my questions. Do you wish to speak with an attorney or do you wish to answer my questions now?" *Sampson,* at 1109.

For all practical purposes, as we have held above, until such time as the equivocal reference to counsel is clarified as not being an actual request for counsel, it must be treated the same as an express and unambiguous request for counsel. *Cf. Griffin,* 754 P.2d at 969. ("[W]hen an accused makes an arguably equivocal request for counsel during custodial interrogation, further questioning must be limited to clarifying the request.") The question then becomes whether the Constitution, or only *Miranda,* is violated if police disregard an invocation of the right to counsel and obtain a confession.

The answer is clear. *Edwards* and its progeny teach that once the right to counsel has been invoked "subsequent incriminating statements made without [the defendant's] attorney present [violate] the rights secured to the defendant by the *Fifth and Fourteenth Amendments to the United States Constitution.*"[26] *Oregon v. Bradshaw,* 462 U.S. 1039, 1043, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983) (emphasis added); *See Shea v. Louisiana,* 470 U.S. 51, 52, 105 S.Ct. 1065, 1066, 84 L.Ed.2d 38 (1985) (interrogation subsequent to a request for counsel violates Fifth and Fourteenth Amendments). *See also Minnick,* 111 S.Ct. at 489 (valid waiver cannot be

established by showing that defendant responded to further questions).

In *Roberson,* the Court stated: "Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire [for] counsel, he 'is not subject to further interrogation ... until counsel has been made available to him....'" 486 U.S. at 682, 108 S.Ct. at 2098 (quoting *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1885). Given our view that an equivocal request must be treated like a clear request pending clarification, failure to clarify an equivocal request, and interrogation conducted after that request, clearly do not fall within the rubric of a "mere technical violation" as suggested by the state.

The United States Supreme Court has demonstrated no crypticism or ambivalence in holding violations of the right to counsel during interrogation to be constitutional in nature. *See Minnick,* 111 S.Ct. at 491 ("Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present...."); *Roberson,* 486 U.S. at 683, 108 S.Ct. at 2098–99 (emphasizing distinction between exercise of right to terminate interrogation and remain silent and right to counsel).

We therefore decline to adopt a rule which would relegate failure to clarify an equivocal request for counsel to the status of "mere" *Miranda* violation for *Elstad* purposes.[27]

---

**26.** Insofar as *Martin's* view of an analogy between an equivocal invocation of the right to remain silent and an equivocal request for counsel might suggest otherwise, we reject that view. *Cf. Roberson,* 486 U.S. at 683, 108 S.Ct. at 2099 (emphasizing distinction between exercise of right to terminate interrogation and remain silent and right to counsel).

**27.** The state also argues that even if defendant's statements must be suppressed, the derivative physical evidence, chiefly the victim's body, would be properly admitted, presumably by way of photographs and descriptive testimony. The state proceeds upon the assumption that the interrogation subsequent to defendant's equivocal reference to counsel, concededly a violation of the *Miranda* rule, was merely technically defective, not constitutionally infirm. The state

calls our attention to several decisions in which other courts have allowed the admission of derivative evidence obtained subsequent to interrogation conducted in violation of the technical rules of *Miranda.* *See, e.g., United States v. Patterson,* 812 F.2d 1188 (9th Cir.1987), *cert. denied,* 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988); *In re Owen F.,* 70 Md.App. 678, 523 A.2d 627, *cert. denied,* 310 Md. 275, 528 A.2d 1286 (1987); *State v. Wethered,* 110 Wash.2d 466, 755 P.2d 797 (1988). We find the cases cited by the state to be inapplicable, as each addresses violations of the *Miranda* rule which are not deemed constitutional in dimension. We have already held in evaluating the state's *Elstad* argument that the violation of defendant's right to counsel was of constitutional dimension and not merely a violation of *Miranda.*

## CONCLUSION

The subsequent *Miranda* warnings given to defendant did not serve to clarify his prior equivocal request for counsel or somehow make that request go away. The violation was constitutional in magnitude. Accordingly, testimonial and physical evidence derived from all ensuing interrogation must be suppressed.

Having reheard and reconsidered the matter, our initial opinion stands as supplemented herein.

Evidence obtained in violation of the Fifth Amendment is properly suppressed under the fruit of the poisonous tree doctrine. *Supra* at 1111. *See, e.g., Shea v. Louisiana,* 470 U.S. 51, 52, 105 S.Ct. 1065, 1066, 84 L.Ed.2d 38 (1985) (interrogation subsequent to request for counsel violates Fifth Amendment). *See also Nix v. Williams,* 467 U.S. 431, 442 & n. 3, 104 S.Ct. 2501, 2508 & n. 3, 81 L.Ed.2d 377 (1984). While we are not ignorant of the obstacles which the state will face in presenting a case on remand without evidence of the body absent the applicability of some exception to the exclusionary rule, *see supra* at 1111 & n. 19, the derivative evidence of the child's body was obtained as a direct result of interrogation that was improper as a matter of constitutional law, and must, absent some exception, be suppressed. We are not enthusiastic about the obstacles our decision will create to securing defendant's conviction on retrial. But we are unwilling to sidestep important constitutional safeguards to assuage the frustrations that inhere in retrying a defendant clearly guilty of such a heinous crime. *See Nix v. Williams,* 467 U.S. at 442, 104 S.Ct. at 2508.